LEXINGTON HOMES, INC., D/B/A CONTRACTORS WHOLESALE BUILDING SUPPLY, PLAINTIFF v. W. E. TYSON BUILDERS, INC., ORIGINAL DEFENDANT AND THIRD PARTY PLAINTIFF v. OSCAR L. NORRIS, THIRD PARTY DEFENDANT AND LEXINGTON HOMES, INC., D/B/A CONTRACTORS WHOLESALE BUILDING SUPPLY, PLAINTIFF v. W. E. TYSON, DEFENDANT

No. 8412SC230

(Filed 2 July 1985)

Contracts § 34— supplier's interference with building loan contract—evidence sufficient

The evidence was sufficient to support a claim of tortious interference with contract and the trial court erred in directing a verdict against the defendant and third-party plaintiff, W. E. Tyson Builders, Inc., where the evidence viewed favorably to the defendant showed that defendant had entered into a valid construction loan agreement with First Atlantic Corporation and The Northwestern Bank, incident to which defendant had received a draft for $114,210 and deposited it in its account; plaintiff Lexington Homes and its president, third-party defendant Oscar Norris, knew that defendant had the construction loan; knew that the draft had been obtained under the contract and deposited in defendant's account; knew that checks had been written and mailed thereon to other suppliers and that defendant's business would be disrupted if payment on the draft were stopped; nevertheless got First Atlantic to stop payment on the draft by falsely representing that defendant was not going to pay plaintiff and other suppliers from the loan funds; acted without justification for the malicious purpose of coercing or intimidating defendant into immediately paying in full Lexington Home's bill, which was several hundred dollars too high; and caused defendant to stop pay-

ment on several checks it had written against the deposit, which delayed the completion and sale of the houses for several months and increased defendant's expenses in completing the houses by approximately sixty to eighty thousand dollars.

Judge WHICHARD concurring.

Judge JOHNSON concurs in the result.

APPEAL by defendant and third party plaintiff W. E. Tyson Builders, Inc. from *Brewer, Judge.* Judgment entered 29 September 1983 in Superior Court, CUMBERLAND County. Heard in the Court of Appeals 14 November 1984.

This appeal involves two separate civil actions that were consolidated for trial. The first case, 80CVS490, involves (1) a claim by Contractors Wholesale Building Supply, a division of the plaintiff, Lexington Homes, Inc., against W. E. Tyson Builders, Inc. for the price of various supplies and materials sold to W. E. Tyson Builders, Inc. on an open account; (2) a counterclaim by defendant W. E. Tyson Builders, Inc. for plaintiff's tortious interference with its contract with First Atlantic Corporation and The Northwestern Bank; and (3) a third party action by defendant W. E. Tyson Builders, Inc. against Oscar L. Norris, plaintiff's president, for interfering with the same contract. The second case, 82CVS3207, involves plaintiff's claim for fraud against defendant W. E. Tyson and his counterclaim against plaintiff for interfering with the aforesaid contracts of W. E. Tyson Builders, Inc. and for loss of value of his capital stock in that company. At the close of plaintiff's evidence the court granted the motion of W. E. Tyson for directed verdict in the fraud case, but denied the motion of W. E. Tyson Builders, Inc. for directed verdict in the open account case. At the end of all the evidence the court directed verdict against both defendants on their counterclaims and also against the third party claim of W. E. Tyson Builders, Inc. This left for adjudication only plaintiff's open account claim against Tyson Builders and before it was submitted to the jury plaintiff took a voluntary dismissal without prejudice. The only appeal is by the defendant and third party plaintiff, W. E. Tyson Builders, Inc., for the dismissal of its contract interference claims against plaintiff and Oscar L. Norris. The evidence presented during the trial pertinent to this appeal tended to show the following:

W. E. Tyson owned all the stock in W. E. Tyson Builders, Inc., which was engaged in the business of building dwelling houses and selling them directly to customers. In June, 1979 the corporation decided to build a house on each of ten building lots that it owned in a Cumberland County subdivision known as Golf Acres, and obtained a written commitment from First Atlantic Corporation, a wholly owned subsidiary of The Northwestern Bank, to loan it $307,000 to defray the cost of constructing the ten houses. The loan was secured by a deed of trust on the ten lots in favor of The Northwestern Bank. Construction proceeded in a normal manner and in August, 1979 Tyson Builders received a first draw of $165,246 on the construction loan; it deposited the draft or check in the company's bank account, and immediately issued checks to suppliers and subcontractors for the amounts then due them. Construction continued to progress and shortly before Monday, 26 November 1979, Tyson Builders applied for a second disbursement on the construction loan and on that date it received a sight draft drawn by First Atlantic on The Northwestern Bank in the amount of $114,210. The draft was deposited that day in Tyson Builders' checking account with Southern National Bank, and Tyson Builders got ready to issue checks to suppliers and contractors that had furnished materials for or done work on the houses involved. The next morning, Tuesday, 27 November, Tyson Builders wrote and mailed checks to six such suppliers or subcontractors in the total amount of about $42,000; but a check was not issued to plaintiff at that time, because in checking some of the invoices for supplies and materials sold to defendant some overcharges were noted and it was decided to delay plaintiff's check until the rest of the invoices could be checked against the prices quoted when the materials were ordered, which would take another day or two.

During the afternoon of 27 November 1979, Tommy D. Spiller, an employee of plaintiff, telephoned W. E. Tyson and asked that plaintiff's outstanding invoices for materials furnished on the ten houses be paid immediately. Tyson told him of the billing errors that had been discovered; that the rest of plaintiff's invoices were being checked and payment would be made just as soon as the correct amount due could be verified, which would be no later than Friday, 30 November; that the next day, Wednesday, 28 November, he had to be in Charlotte but would be back in

Fayetteville either that night or Thursday, and in all events would check the invoices and pay plaintiff the amount due no later than the upcoming Friday. Almost immediately after that telephone conversation was completed Spiller telephoned Tyson again and substantially the same conversation was had. And a few minutes after that second telephone conversation ended Tyson received a call from plaintiff's president, Oscar L. Norris, who also asked that the account be paid at once and was told somewhat the same thing that Spiller was told. Norris then stated to Tyson that unless Tyson Builders paid plaintiff $39,975.32, the amount of plaintiff's invoices, by two o'clock the next afternoon he would file a lien on the ten houses and have payment stopped on the $114,210 sight draft. Tyson told Norris that he hoped he would not file liens and have payment on the draft stopped because about $40,000 worth of checks had already been mailed out and that would disrupt their business; and he again stated that plaintiff would be paid everything due it no later than the following Friday, after he had had a chance to verify the amount owed. Norris then telephoned Bobby Thompson, an employee of First Atlantic, and told him that "Tyson was not going to use the loan money to pay the construction bills on the houses" and requested that First Atlantic stop payment on the draft given Tyson. Thompson relayed that information to his superior in the company, Will McClain, who talked with the company's title insurer that night and stopped payment on the draft the next morning, Wednesday, 28 November. McClain, by telephone, then advised Tyson's bank of the step taken, and tried to telephone Tyson but was told that he was away for the day. McClain then telephoned Tyson's lawyer, who advised him not to stop payment on the draft. Plaintiff and six other suppliers and subcontractors filed liens against the ten houses that day. One subcontractor who later filed a lien telephoned Tommy Spiller for information since plaintiff was the defendant's biggest supplier, and Spiller told him that plaintiff was filing a lien and its lawyer was also filing liens for three or four subcontractors who did not have lawyers.

Tyson returned to his office on Thursday, 29 November, and after learning what had happened he had payment stopped on the several checks that had been mailed to suppliers two days earlier, as funds in the company's account were no longer sufficient to

cover them. He also checked the rest of plaintiff's invoices and verified that plaintiff had overcharged the defendant in the amount of $886. On Thursday, 29 November, First Atlantic issued a second draft for $114,210, which was made payable jointly to Tyson Builders and its attorney and was mailed to the attorney. Appended to the draft was a letter instructing the attorney to use the funds to pay off all liens filed against the mortgaged premises and to pay the balance to Tyson Builders. Tyson returned the draft to First Atlantic. Sometime thereafter — but how and when the record does not show — the liens were either paid, bonded or dismissed and none of them were of record when the case was tried. Tyson testified that: Stopping payment on the $114,210 draft increased the expense of W. E. Tyson Builders on the ten house project between $60,000 and $80,000. Before payment was stopped the sale of four of the ten houses had been arranged and good looking applications for the purchase of five other houses had received preliminary approval, but the whole operation came to a halt after payment was stopped and liens were filed. To finish the houses and continue paying the people who worked for the company he had to find other financial sources and it was late the following spring before any sales were closed out.

*Hutchens & Waple, by H. Terry Hutchens and John K. Burns, Jr., for plaintiff appellee.*

*J. Duane Gilliam and Barrington, Jones, Armstrong & Flora, by Carl A. Barrington, Jr., for defendant and third party plaintiff appellant W. E. Tyson Builders, Inc.*

PHILLIPS, Judge.

The only question raised by this appeal is whether the evidence presented at trial was sufficient to support the claim of W. E. Tyson Builders, Inc. that Lexington Homes, Inc. and Oscar L. Norris tortiously interfered with its contract with First Atlantic Corporation and The Northwestern Bank. We are of the opinion that the evidence was sufficient to support the claim made and that the trial court erred in directing a verdict against the defendant and third party plaintiff, W. E. Tyson Builders, Inc.

It has long been the law in this State that one who tortiously interferes with the contract rights of another is liable for the

damage caused thereby. *Jones v. Stanly,* 76 N.C. 355 (1877). When viewed favorably to the defendant, as the law requires, the evidence presented tends to show the following: In furtherance of its plan to build houses on the Golf Acres lots and sell them, defendant had entered into a valid construction loan agreement with First Atlantic Corporation and The Northwestern Bank, incident to which defendant had received a draft for $114,210 and deposited it in its account. Lexington Homes and its President, Oscar L. Norris, knew that defendant had the construction loan; that the $114,210 draft obtained under the contract had been deposited in defendant's bank account; that checks had been written and mailed thereon to other suppliers in the approximate amount of $42,000; and that defendant's business would be disrupted if payment on the draft was stopped. Lexington Homes and Norris nevertheless got First Atlantic to stop payment on the draft by falsely representing to it that defendant was not going to pay plaintiff and the other suppliers from the loan funds; and they did this without justification for the malicious purpose of coercing or intimidating defendant into immediately paying in full plaintiff's bill, which was several hundred dollars larger than it should have been. The unjustified interference by the appellees caused defendant to stop payment on the several checks it had written against the $114,210 deposit, and caused some checkholders to file liens against the property; delayed the completion and sale of the houses for several months; and increased defendant's expenses in completing the houses in the approximate amount of $60,000 to $80,000.

While the rule laid down in 86 C.J.S. *Torts* § 44 that an action will lie against one who wrongfully interferes with the contract rights of another had been recognized by our Supreme Court in numerous cases, including *Bryant v. Barber,* 237 N.C. 480, 75 S.E. 2d 410 (1953), *Coleman v. Whisnant,* 225 N.C. 494, 35 S.E. 2d 647 (1945), and *Jones v. Stanly, supra,* so far as our research discloses, the proof required for such an action had not been itemized until *Childress v. Abeles,* 240 N.C. 667, 84 S.E. 2d 176 (1954). In *Childress* the Court stated that in these cases it is necessary to show: (1) That a valid contract existed between the plaintiff and a third person, conferring upon the plaintiff some contractual right against the third person; (2) that the outsider had knowledge of the plaintiff's contract with the third person; (3)

that the outsider intentionally induced the third person not to perform his contract with the plaintiff; (4) that in so doing the outsider acted without justification; (5) that the outsider's act caused the plaintiff actual damages. *Id.* at 674, 84 S.E. 2d at 181, 182. It is obvious, we think, that the requisites stated, except that the tortfeasor be an "outsider," are met by the evidence recorded in this case, but what an "outsider" is was not explained by the *Childress* Court, though it cited with approval *Jones v. Stanly, supra,* a case which certainly involved a "non-outsider," if there be such a thing. In that case a judgment against the President and Superintendent of the Atlantic & North Carolina Railroad for wrongfully causing the railroad that he managed not to perform its contract to transport a large number of crossties for plaintiff was reinstated, without the Court even intimating that the defendant's status as an insider excused or justified the tort committed. In a later case involving another defendant that had a legitimate interest in and was closely connected with the contract allegedly interfered with the Court clarified this ambiguity in the *Childress* decision by declaring that a "defendant's status as an outsider or a non-outsider is pertinent only to the question of justification for his action," *Smith v. Ford Motor Co.,* 289 N.C. 71, 88, 221 S.E. 2d 282, 292 (1976), and held that Ford Motor Company had no right to interfere with its dealer's management contract with plaintiff for any purpose other than promoting the efficient operation of the dealership. Since the evidence in this case tends to show that plaintiff and Norris acted unjustifiably for the improper purpose of obtaining payment of a sum defendant did not owe, plaintiff's status as a creditor entitled to collect the actual amount that defendant owed it is immaterial to the case, as explained later.

The appellees contend here, as they did in obtaining the dismissal in the court below, that the evidence presented was insufficient to establish the following three things defendant was obliged to prove; that First Atlantic *breached* its contract with defendant; that appellees were not justified in having payment on the $114,210 draft stopped; and that defendant was actually damaged as a consequence of the interference. The grounds relied upon for these contentions and the arguments made in support of them are largely irrelevant to the thrust and tenor of defendant's case against them and the recorded evidence in support of it.

First of all defendant does not have to prove that appellees caused First Atlantic to *breach* its contract with defendant, because its claim is only that appellees wrongfully *interfered* with defendant's rights under the contract; and clear, direct evidence that appellees did wrongfully interfere with its contract rights was presented. According to the evidence, the appellees caused First Atlantic to stop payment on the draft that defendant lawfully had in its bank account and had written checks against. That defendant had a right to possess the draft and use it free from the wrongful interference of others is clearly inferable from the facts that it had a loan agreement with First Atlantic, a lending rather than an eleemosynary institution, and that First Atlantic issued and delivered the draft to defendant. That defendant did not show, as appellees contend, that the underlying loan agreement required First Atlantic to issue the draft at that time and in that amount, or that the draft might have been issued later or in a different way without recourse on defendant's part, is beside the point. As Justice Barnhill so cogently pointed out in the concurring opinion to *Bruton v. Smith*, 225 N.C. 584, 36 S.E. 2d 9 (1945), a party to a contract has the right to reap the benefits of it, such as they are, free from the wrongful interference of others; and since First Atlantic as a contracting party issued the draft to defendant at that time and in that manner defendant had a right to use and enjoy that benefit of its contract free from the wrongful interference of the appellees or anyone else.

The appellees' argument as to justification, equally wide of the mark, starts and stops with their legitimate interest in obtaining early payment of the sum owed from the funds received by defendant. The evidence which tends to show that the appellees falsely claimed that defendant was not going to pay it or the other suppliers and contractors with the draft funds, and that their purpose was to obtain several hundred dollars in funds plaintiff was not entitled to was not even addressed.

And as to damages, the appellees simply and incorrectly argue that W. E. Tyson's testimony that defendant incurred "some seventy or eighty thousand dollars in additional expenses" in the construction of the ten houses did not "rise above the level of speculation" and that no other evidence of damages was presented. In the first place, Tyson's testimony as to the extra expense incurred because payment of the draft was stopped was

purportedly based on the witness's personal knowledge, and was thus factual, rather than speculative, in nature. In the second place, the witness's purported knowledge of what he testified to was neither gainsaid by other evidence, nor questioned by the appellees, who waived cross-examination. Nor is it fatal to defendant's case that Tyson neither itemized the additional expenses he claimed were incurred nor explained in any detail why defendant did not accept the $114,210 draft that First Atlantic issued to defendant and its lawyer two days after payment on the first draft was stopped. These weaknesses in the witness's testimony go to its weight, they do not affect its legal sufficiency. Furthermore, the testimony as to the extra expense incurred because payment on the draft was stopped was not the only evidence presented as to defendant's damages. Tyson also testified that defendant had to stop payment on checks of its own amounting to about $42,000 and that those six or seven checkholders filed liens against the property when their checks were cancelled. This evidence by itself tends to show that defendant was actually damaged in some pecuniary amount by the tort complained of. That Tyson did not further testify as to the amount of the charges that defendant had to pay for stopping payment on the several checks and for the several lien filings, does not mean that defendant was not damaged thereby; it only means that the evidence could not support an award of damages in any *substantial* amount. But the evidence is sufficient to support an award of nominal damages, as our law provides that where a legal wrong is shown, the one wronged is entitled to nominal damages, though no substantial loss or damage has been proved. *Hairston v. Atlantic Greyhound Corp.*, 220 N.C. 642, 18 S.E. 2d 166 (1942); *Bowen v. The Fidelity Bank*, 209 N.C. 140, 183 S.E. 266 (1936). In order to make out a case for the jury the victim of contract interference does not have to show that *substantial* damages resulted; it is enough if the evidence shows that the victim suffered some damage, and the evidence presented in the trial below tended to show that.

Reversed and remanded.

Judge WHICHARD concurs.

Judge JOHNSON concurs in the result.

Lexington Homes, Inc. v. W. E. Tyson Builders, Inc.

Judge WHICHARD concurring.

The scope of a claim for tortious interference with contract includes not only procurement of breach but also all invasions of contractual relations that retard, make more difficult, or prevent performance, or make performance of less value to the promisee. Annot., 84 A.L.R. 43, 52 (1933); *see generally* Carpenter, "Interference with Contract Relations," 41 Har. L. Rev. 728 (1928). If defendant here cannot prove breach — since its contract with First Atlantic did not specify a date it was due the funds and since First Atlantic reissued the check within one day after it stopped payment on the draft — defendant has at least presented evidence that due to the filing of liens against its property subsequent performance of the contract was of less value to it.

As to the element of justification, 75 N.C. App. 404, 411, 331 S.E. 2d 318, 322 (1985), to be actionable interference with contract must be otherwise than in the legitimate exercise of one's own equal or superior right. *Carpenter* at 763. Whether plaintiff and third party defendant were unjustifiably demanding early payment or were acting within a privilege to protect a right to money due is ordinarily a question for the jury. *See* Annot., 26 A.L.R. 2d 1227, 1264 (1952). I do not believe that on the evidence here we can say as a matter of law that plaintiff and third party defendant acted with or without sufficient legal reason. *Childress v. Abeles*, 240 N.C. 667, 674-75, 84 S.E. 2d 176, 182 (1954) ("Justification imports 'a sufficient lawful reason why a party did or did not do the thing charged, a sufficient lawful reason for acting, or failing to act. It connotes just, lawful excuse, and excludes' legal 'malice.' ").

For these reasons and for those stated in the opinion, *supra*, I agree that the evidence on defendant Tyson Builders' counterclaim, viewed in the light most favorable to it, is sufficient to support a claim for tortious interference with contract and to withstand plaintiff and third party defendant's motion for directed verdict.