**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ENGLISH BOILER & TUBE,
INCORPORATED, A Virginia
Corporation,
<u>Plaintiff-Appellant,</u>

v.

W.C. ROUSE & SON, INCORPORATED,

No. 97-2397

A North Carolina Corporation;
THOMAS K. ROUSE, In his official
corporate capacity and his
individual capacity; THE
BABCOCK & WILCOX COMPANY, A
Delaware Corporation,
<u>Defendants-Appellees.</u>

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-96-516-5-BR)

Argued: October 30, 1998

Decided: February 23, 1999

Before WILKINSON, Chief Judge, WIDENER, Circuit Judge,
and WILSON, Chief United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Irving M. Blank, PARIS, BLANK & BROWN, P.C.,
Richmond, Virginia, for Appellant. Christopher Terry Graebe, WOM-
BLE, CARLYLE, SANDRIDGE & RICE, P.L.L.C., Raleigh, North
Carolina; J. Matthew Little, TEAGUE, CAMPBELL, DENNIS &
GORHAM, L.L.P., Raleigh, North Carolina, for Appellees. **ON
BRIEF:** William H.C. Venable, PARIS, BLANK & BROWN, P.C.,
Richmond, Virginia, for Appellant. James E.R. Rutledge, TEAGUE,
CAMPBELL, DENNIS & GORHAM, L.L.P., Raleigh, North Caro-
lina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Plaintiff-appellant English Boiler & Tube, Inc. ("English") brought
suit in the United States District Court for the Eastern District of
North Carolina against Defendants-appellees W.C. Rouse & Son
("Rouse") and Babcock & Wilcox Company ("B&W") for defama-
tion, tortious interference with contract, and statutory claims based on
N.C. Gen. Stat. § 75-1.1 (1996).**1**  The District Court concluded that
English's amended complaint did not relate back to the filing of the
original complaint and that the one year statute of limitations barred
one of English's claims for defamation. The District Court found that
the remaining defamation claims arose out of communications on
issues of public concern, and, consequently, required fault as a com-
ponent of liability. Because English could not demonstrate fault on
the part of Rouse or B&W, the District Court entered summary judg-

_____

**1** The statutory claims encompassed claims for unfair trade practices, in
the form of civil conspiracy, tortious interference with contract, and defa-
mation.

2

ment for Rouse and B&W on those claims, as well. The District Court granted summary judgment on English's claim for tortious interference with contract, concluding that the conduct of Rouse and B&W was justified as legitimate competition. Finally, the District Court granted summary judgment on English's statutory claims because there was no factual basis to support them. We affirm.

I.

In 1992, Appalachian State University ("ASU") began the process of upgrading its power plant. ASU hired Mechanical Engineers Incorporated ("MEI") to consult on portions of the project, including construction of a new boiler plant. In July 1995, ASU awarded the contract for the mechanical portion of the project to JJ Kirlin Incorporated ("Kirlin"). Kirlin then solicited bids from English, B&W, and others to supply the boilers. Moustafa Karmous ("Karmous"), an engineer with the Office of State Construction ("OSC"), drafted the bid specifications for the boilers. Karmous inserted the names of B&W and two other boiler manufacturers in these specifications as examples of the quality and workmanship that OSC expected from its bidders.[2]

On July 25, 1995, during the bidding process, Graham Hobbs, an employee of Rouse who was also a representative of B&W, sent a letter to Bryon Hamrick ("Hamrick"), president of MEI, lobbying MEI to encourage Kirlin to select B&W. This letter contained disparaging statements about the other bidders, including English.[3] Despite the letter, however, in September 1995, Kirlin selected English. Rouse and B&W then began to encourage Kirlin to replace English with B&W. In a meeting with officials from the OSC and ASU, Rouse and B&W allegedly made disparaging claims about English's financial stability,

_____

[2] The specifications stated that "[m]inimum performance standards for boilers shall equal or exceed those boilers manufactured by" B&W and two other boiler manufacturers.

[3] The Hobbs letter stated, among other things, that "last year, the State of Virginia refused (3) 150,000 LB/HR English Boilers ... based on a review of their track record for meeting ship dates, along with design and the experience factor.... They purchased B&Ws, to[e]nsure no problems. English has NO qualified local NC service for the ASU project."

product, and timeliness. According to English, those claims caused ASU and OSC officials to doubt English's suitability, and eventually, an ASU official expressed his concerns in a letter to Karmous. Those concerns prompted Kirlin to meet on November 29, 1995 with English and Speros Fleggas, another OSC official. After airing the concerns, Fleggas remained satisfied that English could handle the job.

Rouse persisted. On December 6, 1995, it sent a letter to Karmous essentially reiterating its earlier comments. Karmous forwarded this letter to Dr. Clyde Robbins ("Robbins"), Vice Chancellor of Physical Operations and head of the boiler upgrade project at ASU. The letter stated that English had received poor evaluations in earlier projects due to lateness, poor design, and inexperience. [4] The letter also asserted that, because of its inexperience, English habitually redesigned its boilers. Rouse supported most of the allegations in the letter with the names and phone numbers of persons Karmous could call for confirmation.[5] Where Rouse lacked information for further confirmation or could not locate its source's contact information, it so stated in the letter.[6]

After Robbins refused to show the letter to Kirlin, Kirlin sought a copy of the letter from Rouse. Rouse repackaged the allegations in a letter to Kirlin dated December 12th and added some allegations about English's performance on other projects.[7] Kirlin scheduled a

_____

[4] For example, the letter stated that "[w]e have heard that [English] had trouble at the NASA facility at Langley, VA -- problems with tube alignment and quality control on the drum intervals.... The gentleman that I need to talk to [to confirm the information] is out until Thursday, but I will call him back."

[5] The letter stated that "[d]elivery is critical on this project. To get an idea of how John English met his delivery when building for IBW, you can call Jeff Beals ... [who] was President at IBW...." The letter also included the names and phone numbers of other persons whom Karmous could call for information concerning other allegations.

[6] "Even though English boiler[sic] had a much lower price, they were eliminated in the first round.... Pat Lawler is no longer with the state and I was not able to attain [sic] his phone number--but I am working on it."

[7] The December 12th letter alleged that "[s]ince this is not English Boilers' [sic] standard manufacture, they installed additional tubes at all

4

meeting to discuss the matter further. At the January 5, 1996 meeting with ASU officials, Rouse and B&W essentially repeated what they had said earlier. ASU then asked B&W and another interested bidder to submit new bids for the project. The new bids were still higher than English's original bid, and ASU retained English on the project.

On June 11, 1996, English filed its initial complaint against Rouse and B&W, and it filed an amended complaint on March 5, 1997. The District Court decided all claims adversely to English either on motions to dismiss or for summary judgment. We address those rulings, in turn.

II.

English's initial complaint alleged, among other things, that Rouse defamed English by sending the December 6th and December 12th letters (the "Rouse letters") to Karmous and Kirlin, respectively. English's amended complaint additionally claimed defamation arising out of Hobbs's July 25th letter to Hamrick (the "Hobbs letter"). The District Court concluded that the statute of limitations barred this additional claim because English filed its amended complaint after North Carolina's one-year statute of limitations for defamation had run. English, nevertheless, argues that because the additional defamation alleged in its amended complaint occurred within the same time period and under similar circumstances as the defamation alleged in its original complaint, its amended complaint relates back to the filing of its original complaint under Federal Rule of Civil Procedure 15(c) so as to save those additional defamation claims from the statute of limitations. Because English did not mention the Hobbs letter in its original complaint or even allege a separate defamatory publication that we could liberally construe to include the letter, we disagree. We find, instead, that publication of the Hobbs letter does not arise out of the same conduct, transaction, or occurrence described in the original complaint, and, therefore, that the claim does not relate back to the filing of the original complaint. Accordingly, we agree with the

_____

sorts of weird angles in order to meet the intent of the specifications. The insulation was bad, causing hot spots which had to be field service corrected. You can contact Mr. Terry Heil ... concerning this job."

5

District Court that North Carolina's one-year statute of limitations for defamation bars the claim.

A claim, otherwise untimely, will relate back to the date of filing of the original pleading if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." Fed. R. Civ. P. 15(c). A claim arises out of the same conduct, transaction, or occurrence if: (1) there is a factual nexus between the original complaint and the amendment;[8] and (2) the defendants had notice of the claim and would not be prejudiced by the amendment. See Grattan v. Burnett, 710 F.2d 160, 163 (4th Cir. 1983). A plaintiff may not baldly allege a broad course of conduct over a lengthy period of time and later sue on any act that occurred during that time period. Because the Hobbs letter is a separate instance of defamation arising from "facts other than those originally pleaded," a claim based on that letter does not relate back to the original filing date. Gibson v. Mutual Life Ins. Co., 465 S.E.2d 56, 58 (N.C. 1996). Each act of defamation is a separate tort that, in most instances, a plaintiff must specifically allege. See id. (stating that "each publication of defamatory material is a separate tort."); Rickman v. Cone Mills Corp., 129 F.R.D. 181, 186 (D. Kan. 1989) (stating that "[a]n amendment will not relate back if it sets forth a new set of operational facts" and finding no relation back where the new counts "named new parties to whom allegedly defamatory words were published as well as new dates of publication."); Caudle v. Thomason, 942 F. Supp. 635, 638 (D. D.C. 1996) ("in order to plead defamation, a plaintiff should allege specific defamatory comments [including] `the time, place, content, speaker, and listener of the alleged defamatory matter.'") (quoting Wiggins v. Phillip Morris, Inc., 853 F. Supp. 458, 465 (D. D.C. 1994)).

The court would be nullifying the notice requirement of the relation back doctrine if it were to permit a claim arising out of the Hobbs letter to relate back. The Hobbs letter had a different author and recipi-

_____

[8] The District Court assumed the existence of a nexus between the amendment and the original complaint on the theory that all of the defamatory statements derived from the same campaign to disparage English. See English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc., No. 5:96-CV-516-BR(3) (E.D.N.C. Sept. 9, 1997). We will do the same.

6

ent than the Rouse letters, and was published on a different date. It is a separate act of defamation. The court would be allowing English to leave the statute of limitations open-ended for additional acts of defamation, even though these acts involved different parties on different dates. Because English did not plead this separate act of defamation in its original complaint, Rouse and B&W had insufficient notice of the claim. The additional claim arising out of the Hobbs letter, therefore, does not relate back to the filing date of the original complaint, and the statute of limitations bars it. **9**

III.

We next examine whether English raised a genuine issue of fact concerning its other defamation claims against Rouse and B&W. These defamation claims arise from the Rouse letters, which essentially memorialize Rouse's various allegations about English described in the initial complaint. In granting summary judgment against English's claims, the District Court looked to the constitutional boundaries for defamation set forth in Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 761 (1985), and Gertz v. Robert Welch, Inc., 418 U.S. 323 (1974) (requiring fault as a component of liability for statements of public concern). The District Court concluded that because Rouse's statements addressed issues of public concern, English was required to demonstrate negligence on the part of Rouse and B&W as a component of liability. Because English failed to offer any evidence that raised a triable issue of fact concerning Rouse's and B&W's negligence, the District Court granted summary judgment against English's defamation claims. We agree with much of the District Court's reasoning. However, we find it unnecessary to reach the constitutional issues that lie at the heart of the District Court's analysis. Although the District Court granted summary judgment on a different ground, "we can affirm on any legal ground supported by the record and are not limited to the grounds relied on by the district court." Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir.

_____

**9** We note that even if English's defamation claim based on the Hobbs letter is not time barred, it still suffers from the same substantive defects as the claims relating to the Rouse letters. See infra Part III (finding that English failed to demonstrate actual malice by Rouse and B&W, and thus, could not pierce Rouse's and B&W's common law privilege).

7

1993). We find, instead, that North Carolina's common law qualified privilege provides an adequate and independent basis for affirming the District Court's grant of summary judgment against English's claims. This common law privilege protected Rouse's statements because those statements addressed matters of public interest, were published on proper occasions, and were disseminated only to proper parties that shared a common interest with Rouse and B&W. We affirm the entry of summary judgment against English's defamation claims because we conclude that English failed to demonstrate actual malice and, thus, failed to pierce Rouse's and B&W's common law privilege.

North Carolina recognizes a common law qualified privilege for publication of statements that are

> made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or duty, if made to a person having a corresponding interest or duty on a privileged occasion and in a manner and under circumstances fairly warranted by the occasion and duty, right, or interest.

Troxler v. Charter Mandala Ctr., Inc., 365 S.E.2d 665, 668 (N.C. Ct. App. 1988) (quoting Gibby v. Murphy, 325 S.E.2d 673, 676 (N.C. Ct. App. 1985)). North Carolina courts have defined the elements of a qualified privilege as: "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." Hanton v. Gilbert, 486 S.E.2d 432, 437 (N.C. Ct. App. 1997) (quoting Stewart v. Nationwide Check Corp., 182 S.E.2d 410, 415 (N.C. 1971)). A proper occasion is "an occasion when for the public good and in the interests of society one is freed from liability...[because of] the occasion of its publication...." Ponder v. Cobb , 126 S.E.2d 67, 78 (N.C. 1962). To prevail against this privilege, a "plaintiff is required to show that the defendant used the privileged occasion artfully and knowingly to falsely defame the plaintiff." Kinloch v. News & Observer Pub. Co., 314 F. Supp. 602, 606-07 (E.D.N.C. 1969). The appropriate standard of fault is actual malice, and the court determines whether a statement is privileged as a matter of law. See Hanton, 486 S.E.2d at 437. If the court determines that a statement

8

is privileged, then a "presumption arises in[the defendant's] favor that the statements were made in good faith and without malice." Id. A plaintiff, therefore, would have "the burden of proving both the falsity of the charge and that it was made with actual malice." Id.

Rouse and B&W were participants in a public bidding process for a government contract, and, as such, shared a common interest with the state officials who supervised the project. Rouse addressed its comments solely to these officials, all of whom were"proper parties from or through whom redress might be expected." Ponder, 126 S.E.2d at 78 (applying privilege to a party chairman's criticism of county election officials because the party chairman had a "right to comment" and addressed his letters only to "proper parties"). Rouse's allegations, therefore, were published "in a proper manner and to proper parties only." Hanton, 486 S.E.2d at 437. Similarly, Rouse's comments were published on a proper occasion. Rouse made its statements as a bidder for a government contract seeking to promote itself, but in a manner that also brought attention to potential shortcomings of a competitor. More importantly, Rouse made these statements entirely within the confines of the bidding process, and addressed an appropriate subject matter for Rouse, B&W, and the state officials to discuss. There is a strong public interest in allowing free comment between potential contracting parties in a bidding process where public funds are at stake, and where statements are narrowly confined to the merits of individual bidders.[10] There is also a strong public interest in permitting persons to reveal information about the potential use, or misuse, of government funds. Cf. Yancey v. Gillespie, 87 S.E.2d 210, 211-12 (N.C. 1955) (applying qualified privilege to statements relating to a city's excessive expenditure of public money on a lot of property that was of questionable quality); Gattis v. Kilgo, 38 S.E. 931 (N.C. 1901) (finding the existence of a qualified privilege for statements by a college president about an investigation by the college against him because the college "was, in one sense, a public institu-

_____

[10] We do not intimate that a qualified privilege should apply to every statement made about a potential government contractor by a competitor. However, where a competitor makes a statement that addresses only interests arising out of the bidding process, touches upon information of potential pubic interest, and is disseminated only to the proper parties, we are satisfied that North Carolina would apply the qualified privilege.

9

tion."); <u>Mauk, Stastny & Rassam, P.A. v. Bicknell</u>, 625 P.2d 1219, 1222 (N.M. Ct. App. 1980) (applying privilege of fair comment to statements concerning a contractor's bid for a government contract). We find that Rouse published its allegations in appropriate contexts and on proper occasions where "for the public good and in the interests of society one is freed from liability ...[because of] the occasion of its publication...." <u>Ponder</u>, 126 S.E.2d at 78.

We are confident that North Carolina would recognize a qualified privilege that protects a competitor's ability to tout its own product, and, more importantly, to point out the weaknesses of others that are competing for public funds. This is consistent with the important goal of allowing competitors to initiate robust debate concerning a public works project that touches upon the financial and environmental welfare of a community. To discourage the free flow of this potentially important information would harm competition and undermine the public's ability to hold the government accountable for public expenditures. Accordingly, we find that Rouse's statements were privileged. English, therefore, must meet "the burden of proving ... that [the statements were] made with actual malice." <u>Hanton</u>, 486 S.E.2d at 437. In the present case, the record provides uncontroverted evidence that Rouse investigated and verified its information before making any statements about English. Rouse included contact information for its sources in its letters, and encouraged Karmous to verify this information rather than simply to rely on Rouse's allegations. Each of Rouse's sources was employed, or formerly employed, in a position that provided reasonable access to information concerning English's background and qualifications. Against this backdrop, English was required to do more than offer bare allegations of malice. Because English has not demonstrated malice by Rouse or B&W,**11** we affirm the District Court's grant of summary judgment against English's defamation claims.

_____

**11** We note that, in light of Rouse's careful documentation of its sources in its letters, English would likely fail to satisfy even the lighter burden of demonstrating that Rouse was negligent under <u>Dun & Bradstreet,</u> 472 U.S. at 761, and <u>Gertz</u>, 418 U.S. at 323.

10

IV.

We next consider English's claim for tortious interference with contract. English argues that Rouse and B&W wrongfully interfered with its contract with Kirlin by persistently lobbying to replace English and by disparaging English in the course of competition. We find, however, that the actions of Rouse and B&W were justified as legitimate business activity. Accordingly, we affirm the District Court's grant of summary judgment on the claim.

In order to succeed on a claim for tortious interference with contract, a plaintiff must show that: (1) there was a valid contract between the plaintiff and a third person that conferred a contractual right to the plaintiff against the third person; (2) the defendant knew of the contract; (3) the defendant intentionally induced the third person not to perform the contract;[12] (4) in doing so, acted without justification; and (5) caused actual damage to the plaintiff.[13] See United Labs., Inc. v. Kuykendall, 370 S.E.2d 375, 387 (N.C. 1988). An act is justified, or privileged, if "the defendant is acting for a legitimate business purpose" because "competition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." Peoples Sec. Life Ins. Co. v. Hooks, 367 S.E.2d 647, 650 (N.C. 1988). This privilege is "lost if exercised for a wrong purpose," which "exists where the act is done other than as a reasonable and bona fide attempt to protect the interest of the defendant which is involved." Id. In assessing whether a defendant's conduct is justified, courts examine the following factors: the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in protect-

_____

[12] To satisfy this prong, the third person need not actually breach the contract. See Lexington Homes, Inc. v. W.E. Tyson Builders, Inc., 331 S.E.2d 318, 322 (N.C. Ct. App. 1985).

[13] We note that English successfully completed its contract with Kirlin, and that, as a result, it is questionable whether English can demonstrate any actual damage from the efforts of Rouse and B&W. We need not reach this issue, however, because Rouse's and B&W's actions were otherwise justified.

11

ing the freedom of action of the actor, and the contractual interests of the other party. See id.

In the present case, B&W competed with English for a boiler replacement contract. Rouse and B&W sent letters and initiated meetings with officials at ASU, OSC, and MEI in an attempt to convince these entities to award them the contract. Rouse's and B&W's interference, in the form of letters and meetings, constitutes conduct that "may be justified when the plaintiff and the defendant are competitors." Peoples Sec., 367 S.E.2d at 650. The record does not indicate that their actions were in any way "exercised for a wrong purpose," or that they acted for any reason "other than as a reasonable and bona fide attempt to protect the interest of the defendant which is involved." Id. Absent any evidence of a wrongful purpose, we must conclude that the conduct of Rouse and B&W was justified as legitimate business activity.

We note that, at its heart, this suit concerns the North Carolina bidding process and the ability of a bidder to supply potentially pertinent information concerning competitors, as well as the ability of a competitor to engage in salesmanship in the course of bidding. This is a state process that, in large part, relies on market forces as much as judicial oversight. Absent proof that a competitor has acted maliciously or otherwise unlawfully, courts should be reluctant to impose liability for conduct that can be characterized fairly as legitimate competition and salesmanship.[14] We conclude, therefore, that, at most, Rouse and B&W acted zealously, but lawfully, in their attempts to procure the boiler replacement contract with Kirlin. Accordingly, because the conduct of Rouse and B&W was justified, [15] we affirm the judgment of the District Court.

_____

[14] English argues that the actions of Rouse and B&W were not fair because much of their information was untrue. English seeks to impose a strict liability standard for truthfulness upon its competitors. This theory of liability, if applied, would harm legitimate competition.
[15] English argues that the principle that competitive conduct is justifiable if exercised for a legitimate business purpose is limited to cases involving employment contracts. However, in Carolina Water Serv., Inc. v. Town of Atlantic Beach, 464 S.E.2d 317, 320-21 (N.C. Ct. App. 1995), the court utilized this very concept in a case involving a dispute between a municipality and a private company over water supply contracts.

12

V.

Finally, we address English's statutory claims under section 75-1.1. These statutory claims encompass claims for civil conspiracy, defamation, and tortious interference with contract. English argues that Rouse and B&W conspired with Karmous and Robbins to "lock" the contract bid in B&W's favor. English also asserts that Rouse and B&W defamed English and tortiously interfered with its contract by lobbying to replace English and disparaging English in the course of competition. English contends that these actions were unfair and deceptive, and, therefore, violated section 75-1.1. We agree with the District Court, however, that even when viewed in the light most favorable to English, the facts do not support liability under section 75-1.1. Accordingly, we affirm the District Court's grant of summary judgment on the statutory claims.

Section 75-1.1 applies to unfair and deceptive conduct, and provides a right of action against defendants who "engage[ ] in an unfair or deceptive trade practice, in or affecting commerce, that proximately caused actual injury to the plaintiff." Canady v. Mann, 419 S.E.2d 597, 602 (N.C. Ct. App. 1992). Under section 75-1.1, "[c]onduct is unfair if it has the capacity or tendency to deceive." Id. The court determines if conduct is unfair or deceptive by examining "the surrounding circumstances of the transaction and the impact on the marketplace ... and this determination is a question of law for the court." Id.

A.

English argues that Rouse and B&W conspired with Karmous and Robbins to insert B&W's brand name into the bid specifications, thereby providing an unfair advantage to B&W in violation of N.C. Gen. Stat. §§ 133-2 & -3.[16] English contends that this conspiracy was

_____

[16] Sections 133-2 and -3 allow the use of brand names only in certain circumstances. When brand names are used, the statute requires the presence of certain language explaining that the use of such name brands are not designed to restrict competition. See N.C. Gen. Stat. § 133-3 (1996). As the District Court noted, it appears that such language was in fact

13

unfair and deceptive, and thus violated section 75-1.1. We disagree. To prove civil conspiracy, English must show "an agreement between two or more individuals to do an unlawful act or to do a lawful act in an unlawful way, resulting in injury inflicted by one or more of the conspirators pursuant to a common scheme." Morrison-Tiffin v. Hampton, 451 S.E.2d 650, 658 (N.C. Ct. App. 1995). English must also demonstrate "that an overt act was committed pursuant to a common agreement and in furtherance of a common objective." Id. Notably,

> Although liability may be established by circumstantial evidence, the evidence of the agreement must be more than a suspicion or conjecture to justify submission to the jury....An adequately supported motion for summary judgment by the defendant triggers the plaintiff's responsibility to produce facts, as distinguished from allegations, sufficient to show that he will be able to prove his claim at trial.

Id. English argues that Karmous and Robbins must have conspired with Rouse and B&W because Karmous and Robbins favored B&W over English, and because Karmous used B&W's brand name in the bid specifications to illustrate the minimum performance standards for prospective bidders. English argues that the inclusion of B&W's brand name in the specifications "locked" the bid in B&W's favor, giving an unfair advantage to B&W. Based upon these simple facts, English concludes that Karmous and Robbins must have conspired with Rouse and B&W to rig the bidding process. In the absence of any supporting facts, however, this allegation is nothing more than mere "suspicion or conjecture" by English, and is insufficient "to justify submission to the jury...." Id. On the one hand, Rouse and B&W

_____

included in the specifications, despite English's claims to the contrary. See English Boiler, No. 5:96-CV-516-BR(3), slip op. at 37 (E.D.N.C. Sept. 9, 1997).

Section 133-2 provides, in pertinent part, that "[i]t shall be unlawful for any architect, engineer, designer or draftsmen, employed on ... State ... works, to employ or allow any manufacturer, his representatives or agents, to write, plan, draw, or make specifications for such works or any part thereof." N.C. Gen. Stat. § 133-2 (1996).

have offered testimony from several persons, including Karmous, that no such agreement existed. English, on the other hand, has failed to offer any testimony that either demonstrates the existence of a conspiracy or contradicts Karmous's testimony. English, therefore, is left with speculation--a bare, factually unsupported assertion of a conspiracy to rig the bidding process. Speculation, however, is insufficient to create a triable issue of fact. See Beale, 769 F.2d at 214 (stating that the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building one inference upon another.").

B.

We also find that English has failed to raise a genuine issue of fact concerning its statutory defamation and tortious interference with contract claims.**17** English's statutory claims**18** fail for the same reasons as English's common law claims. Cf. Pleasant Valley Promenade v. Lechmere, 464 S.E.2d 47, 54 (N.C. Ct. App. 1995) (dismissing claim for unfair trade practices that relied upon the same factual allegations as those supporting underlying claims for civil conspiracy and tortious interference with contract, where the court directed verdict

_____

**17** English contends that summary judgment is inappropriate because unfair and deceptive conduct is an issue for the jury to decide. In particular, English points to a report submitted by English's expert witness stating that the Defendants' conduct was unfair and deceptive. This argument is not persuasive, however, because although the question of whether an act occurred is a factual issue for the jury, the question of "[w]hether an act found by the jury to have occurred is an unfair or deceptive practice ... is a question of law for the court." Ellis v. Northern Star Co., 388 S.E.2d 127, 131 (N.C. 1990).

**18** English's statutory defamation claim includes the Hobbs letter, which is barred by the statute of limitations as a substantive claim on its own, but which can still proceed as a claim under section 75-1.1. See Ellis, 388 S.E.2d at 131 (stating that libel per se can be an unfair and deceptive trade practice). Similar to the Rouse letters, however, Hobbs detailed the sources of his information during deposition and offered evidence that he engaged in a diligent investigation before publishing his statements about English. As a result, English could not demonstrate Rouse's and B&W's fault with respect to the Hobbs letter, and thus, failed to pierce the common law privilege.

15

against the underlying claims for insufficient evidence). English offered no evidence of unfair or deceptive trade practices beyond those already detailed above. See supra Parts III, IV (discussing English's common law claims for defamation and tortious interference with contract). As noted above, we affirmed the District Court's grant of summary judgment against English's claims for defamation and tortious interference with contract because English failed to raise any triable issues of fact concerning those claims. Absent any additional evidence that the actions of Rouse and B&W were improper, unethical, or tortious, we find, as a matter of law, that Rouse's and B&W's actions were not unfair or deceptive. Accordingly, we affirm the District Court's grant of summary judgment.

VI.

For the reasons stated, we affirm the judgment of the District Court.

AFFIRMED

16