HOUCK & SONS, INC., Plaintiff,

v.

TRANSYLVANIA COUNTY; Terry Pierce; and Jack McGinnis, Defendants.

No. A–C–90–65.

United States District Court, W.D. North Carolina, Asheville Division.

March 18, 1993.

Grainger R. Barrett, Barrett & Associates, Chapel Hill, NC, for Houck & Sons, Inc.

Robert S. Pierce, C. Winston Gilchrist, Keith A. Clinard, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, for Transylvania County Health Dept. and Transylvania County.

Robert S. Pierce, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, Martha K. Walston, Asst. Atty. Gen., N.C. Dept. of Justice, Raleigh, NC, C. Winston Gilchrist, Keith A. Clinard, Lawrence P. Egerton, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, Mabel Y. Bullock, N.C. Dept. of Justice, Raleigh, NC, for Terry Pierce, John Winston and Joseph McGinnis.

Martha K. Walston, Asst. U.S. Atty., N.C. Dept. of Justice, Raleigh, NC, C. Winston Gilchrist, Keith A. Clinard, Lawrence P. Egerton, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, Mabel Y. Bullock, N.C. Dept. of Justice, Raleigh, NC, for Joe Gentry.

Kathleen M. Waylett, Associate Atty. Gen., Mabel Y. Bullock, N.C. Dept. of Justice, Raleigh, NC, for Charles Slagle and Clay Pennington.

## MEMORANDUM OF DECISION

DUPREE, District Judge.

Plaintiff, Houck & Sons, Inc. ("Houck"), filed this civil rights action pursuant to 42 U.S.C. § 1983 alleging, among other claims since dismissed, a violation of the equal protection clause and appending a pendent state law claim for tortious interference with contractual relations. The action was tried at Asheville during the weeks of October 13 and 20, 1992, and the jury returned a verdict in favor of plaintiff on both remaining counts in the amount of $350,000. Presently before the court is defendants' timely filed motion for judgment as a matter of law or alternatively for a new trial pursuant to Federal Rules of Civil Procedure 50(b) and 59, respectively. The court heard further oral argument on the motion on February 16, 1993 and now records its decision in this memorandum.

## I. PRIOR PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A. Procedural History

In its amended complaint filed pursuant to 42 U.S.C. § 1983, plaintiff alleged violations of several constitutional provisions and appended a state law claim for tortious interference with contractual relations. Plaintiff originally alleged that defendants violated the takings, substantive and procedural due process, and equal protection clauses all contained in or incorporated through the Fourteenth Amendment of the United States Constitution.

Plaintiff originally named as defendants the Transylvania County Health Department ("TCHD"), Terry Pierce, and Jack S. McGinnis, the current and former directors of TCHD, respectively. Plaintiff also named as defendants, Joe Gentry and John Winston, a former and a current sanitarian for TCHD. Finally, plaintiff named two employees of the North Carolina Department of Environment, Health and Natural Resources ("NCDEHNR"): Charles Slagle, a soil scientist, and Clay Pennington, a regional sanitarian. In its amended complaint, plaintiff added Transylvania County as a defendant.

Prior to opening statements, this court permitted plaintiff to voluntarily dismiss with prejudice defendants Gentry and Winston, the past and current sanitarians for TCHD. In addition, the court adopted the memorandum of the Honorable United States Magistrate Judge J. Toliver Davis recommending that the TCHD and the state defendants, Slagle and Pennington, be dismissed. As to the TCHD's motion to dismiss, Magistrate Judge Davis reasoned that TCHD was not a

proper entity to be sued and, accordingly, recommended that it be dismissed. Furthermore, Magistrate Judge Davis recommended granting the state defendants' motion based on two separate grounds: (1) plaintiff failed to state a claim against them; and (2) the applicable statute of limitations had expired as to them. The court adopted these recommendations and dismissed these defendants prior to trial.

At the close of plaintiff's evidence, the remaining defendants, Transylvania County ("county"), Terry Pierce and Jack McGinnis (hereinafter referred to collectively as "official defendants"), moved for a directed verdict pursuant to Federal Rule of Civil Procedure 50(a). The court granted defendants' motion as to plaintiff's takings clause and procedural and substantive due process claims. Thus, the court submitted to the jury only the equal protection claim and the state law tortious interference with contractual relations claim.

### B. *Facts Underlying Equal Protection Claim*

This action arises out of a dispute between the TCHD and plaintiff relating to the construction and approval of several residential septic tank systems located in Transylvania County, North Carolina. The North Carolina statutory scheme requires Transylvania County to provide public health services and authorizes it to create the TCHD to execute this duty. N.C.Gen.Stat. § 130A–34 (1992). Furthermore, under this statutory scheme, members of the county board of commissioners, pursuant to the requirements outlined in the state statute, appoint the members of the county board of health. *Id.* § 130A–35(b).

This local board of health, after consultation with the board of commissioners, appoints a local health director, in this case defendants Terry Pierce and Jack McGinnis. *Id.* § 130A–40(a). This local health director, along with sanitarians employed by him, are responsible for administering the programs and rules of the local board of health. Although they have the authority to adopt more exacting requirements, *see id.* § 130A–39(b), the Transylvania County Board of Health adopted verbatim the state regulations relating to the installation and approval of septic systems.

In accordance with these rules, local sanitarians, such as former defendants Gentry and Winston, must issue an improvement permit specifying the construction requirements before an installer, registered by the TCHD, begins construction of a septic system. *Id.* § 130A–336(b). After the construction is complete, a sanitarian inspects the site and issues a certificate of completion to the property owner if the site satisfies all pertinent rules and regulations. *Id.* § 130A–337(a) and (b).

A conventional residential septic system, similar to the ones at issue in this case, consists of a septic tank with an outlet to a distribution box which distributes sewage effluent into a nitrification field, and a number of nitrification lines. Each of these lines consists of a perforated PVC pipe and a bed to absorb the effluent.

In areas in which the topography prevents the placement of nitrification fields on a level grade, the installer may utilize a "stepdown." A stepdown is a dam installed in the nitrification trench that is designed to prevent effluent from entering subsequent portions of the nitrification trench until previous portions are full. The majority of plaintiff's equal protection claims relate to defendants' requirements for these nitrification trenches and stepdowns.

Turning to the specifics of plaintiff's allegations, its equal protection claim relates primarily to defendants' denial of certificates of completion on three separate systems that it constructed. The relevant events occurred in the time period beginning on September 16, 1986 and ending on March 25, 1987. The details surrounding the three systems are as follows.

The first system was one constructed by plaintiff for a Mr. Edwin Morrow ("Morrow system"). In early and late September, 1986, former defendant Winston refused to grant a certificate of completion for the Morrow system citing improper covering of nitrification lines, stepdown heights not exceeding twelve inches, and use of gravel not compacted dirt in the stepdowns beds. Both defen-

dant McGinnis, the current health director, and former state defendants Slagle and Pennington subsequently corroborated Winston's denial of the completion certificate. After plaintiff refused to make the changes requested by defendants, Mr. Morrow received the certificate by making the requested modifications.

The second site at issue was installed by plaintiff for a Ms. Jane Shuttleworth ("Shuttleworth system"). On November 4, 1986, former defendant Gentry denied a certificate of completion on this system citing insufficient height in the stepdown dams measuring less than twelve inches. State defendants Slagle and Pennington corroborated Gentry's decision in a letter to defendant McGinnis. The TCHD issued a certificate of completion to Ms. Shuttleworth on January 13, 1987 after the requested modifications had been made to the system.

The third and final septic system at issue was installed by plaintiff on property owned by Mr. Charles Elliot ("Elliot system"). On March 17, 1987, former defendant Winston denied a certificate of completion because he maintained that an upper nitrification line was deeper than necessary and that the surrounding ground contained weathered rock with visible fractures. Again, the state defendants confirmed this determination. TCHD officials issued the property owner a certificate of completion after he agreed to abandon the upper nitrification line.

Plaintiff offered additional evidence relating to its equal protection claim. First, plaintiff sought to prove that a county attorney threatened it with criminal prosecution for covering the lines on the Morrow system. Additionally, plaintiff presented evidence that in several other instances TCHD officials refused to authorize repairs that plaintiff recommended to customers. Finally, as will be discussed in more detail in relation to plaintiff's state law claim, plaintiff presented evidence of instances in which TCHD officials made comments to potential or actual customers about previous problems with plaintiff.

### C. Facts Underlying Tortious Interference Claim

Plaintiff asserts that the same incidents involving defendants' denial of certificates of completion and refusal to approve repairs it recommended to customers also form the basis of its tortious interference claim. These facts were discussed in the previous section and will not be repeated here. In addition, plaintiff produced evidence at trial of a conversation between defendant McGinnis and Mr. Charles Smith, an employee of Ms. Shuttleworth. In direct response to an inquiry by Mr. Smith about whether plaintiff should make the repairs required by the TCHD, defendant McGinnis responded that plaintiff could but that he would not recommend it.

## II. ANALYSIS

### A. Rule 50 Motion for Judgment as a Matter of Law

■ In considering defendants' Rule 50 motion for judgment as a matter of law the court must determine whether sufficient evidence exists in the record as a whole upon which a reasonable fact finder properly could return a verdict in favor of the prevailing party. *Herold v. Hajoca Corporation,* 864 F.2d 317, 319 (4th Cir.1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3159, 104 L.Ed.2d 1022 (1989). In making this determination, the court must view the evidence in the light most favorable to the prevailing party and draw all reasonable inferences in its favor. *Taylor v. Home Insurance Company,* 777 F.2d 849, 854 (4th Cir.1985), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2249, 90 L.Ed.2d 695 (1986). However, the court should not weigh the evidence or assess the credibility of witnesses. *Id.; see also Herold,* 864 F.2d at 319; *Econo Lodges of America, Inc. v. Norcross Econo–Lodge, Ltd.,* 764 F.Supp. 396, 399 (W.D.N.C.1991).

### 1 .Eleventh Amendment Immunity

■ Defendants Pierce and McGinnis, who are sued only in their official capacities, first assert that in performing their duties as local health directors, they were acting as agents of the state and not Transylvania County. Consequently, these official defendants assert that they are entitled to immunity under

the Eleventh Amendment of the United States Constitution. Likewise, Transylvania County argues that because its liability was premised solely on the actions of the official defendants, a finding that these officials were acting on behalf of the state eliminates any basis for county liability.

■ The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." U.S. Const. Amend XI. The Supreme Court of the United States has interpreted the Eleventh Amendment as a jurisdictional limitation on the federal judicial power prohibiting any suit in federal court directly against a state or its agencies. *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.,* — U.S. —, —, 113 S.Ct. 684, 689, 121 L.Ed.2d 605 (1993); *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). Similarly, the Court has interpreted this constitutional provision as a jurisdictional bar to claims against state officials sued in their official capacity if retroactive monetary relief is sought. *Edelman v. Jordan,* 415 U.S. 651, 664–69, 94 S.Ct. 1347, 1356–59, 39 L.Ed.2d 662 (1974). Furthermore, because the Eleventh Amendment is a jurisdictional bar, not merely a defense to liability, plaintiff bears the burden of proof to establish this court's jurisdiction. *See Thomson v. Gaskill,* 315 U.S. 442, 447, 62 S.Ct. 673, 676, 86 L.Ed. 951 (1942); *Watkins v. Milliken & Company,* 613 F.Supp. 408, 415 (W.D.N.C.1984); *Crowder v. Fieldcrest Mills, Inc.,* 569 F.Supp. 825, 827 (M.D.N.C.1983).

By its very terms, however, the Amendment only applies to "one of the United States." U.S. Const. Amend XI. Accordingly, the Supreme Court has ruled that the Amendment generally does not immunize political subdivisions of the state, such as counties and municipalities, even though such entities may execute part of the state's power. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979) (bi-state planning agency not entitled to Eleventh Amendment immunity); *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (local school board not an "arm of state" entitled to Eleventh Amendment immunity). Moreover, county officials sued in their official capacities would similarly not be protected by Eleventh Amendment immunity. *See Dotson v. Chester,* 937 F.2d 920, 930 n. 11, 932 (4th Cir.1991).

The parties disagree as to the analysis the court should employ to determine whether defendants Pierce and McGinnis are entitled to immunity. Plaintiff cites the legal proposition that suits against officials in their official capacities are treated, in all respects other than name, as a suit against the entity of which the officer is an agent. *See Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985); *Revene v. Charles County Commissioners,* 882 F.2d 870, 874 (4th Cir.1989). Accordingly, plaintiff argues that the suit against defendants Pierce and McGinnis should be treated for the purposes of Eleventh Amendment analysis as a suit against the entity for which the official defendants are agents, which plaintiff argues is Transylvania County. Plaintiff's argument, however, puts the proverbial cart before the horse. Before the court can analyze whether a government entity is or is not entitled to Eleventh Amendment immunity, it must determine which entity the official defendants were acting for in performing their duties as local health directors.

As defendants asserted at oral argument on this motion, the Fourth Circuit's analysis in *Dotson v. Chester,* 937 F.2d 920 (4th Cir. 1991), is instructive on the question of whether an official acted on behalf of the state or the county. *Dotson,* 937 F.2d at 924–26; *see also Gulledge v. Smart,* 878 F.2d 379 (4th Cir.1989) (Table, text in WESTLAW) (South Carolina sheriff was a state actor and, therefore, entitled to Eleventh Amendment immunity); *McConnell v. Adams,* 829 F.2d 1319 (4th Cir.1987), *cert. denied, Virginia v. Kilgore,* 486 U.S. 1006, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).

In *Dotson*, the court held that the determination of " 'whether an official acts on behalf of the county or the state is ... a question of state law.' " *Dotson*, 937 F.2d at 924 (quoting *Owens v. Fulton County*, 877 F.2d 947, 950 (11th Cir.1989)). After carefully examining the law of Maryland, the court concluded that the local sheriff acted as a county, not a state, official when operating the county jail. Accordingly, the court held that the county, not the state, was liable for the attorney fees and costs originally assessed against the sheriff. *Id.* at 932.

In another Fourth Circuit case addressing a similar issue, appellants argued that a judgment against certain election officials in their official capacities must be set aside because these officials were acting on behalf of the state. *McConnell*, 829 F.2d at 1326. After examining Virginia's decisional law, the state statutory scheme and the relevant portion of the state administrative code, the court held that the election officials were acting as state employees. *Id.* at 1328. Therefore, the court ruled that the action against these officials amounted to a suit against the state and noted that the state had not waived its Eleventh Amendment immunity. Accordingly, the court held that the judgment against these officials in their official capacity was barred. *Id.* at 1329.

Thus, in order to determine whether defendants Pierce and McGinnis were acting on behalf of the State of North Carolina or Transylvania County, the court must look to the relevant North Carolina law on this issue. Defendants rely heavily on a decision of the North Carolina Court of Appeals which established that the official defendants were agents of the state and consequently immune from suit under the Eleventh Amendment. *See EEE–ZZZ Lay Drain Company v. North Carolina Department of Human Resources ("EZ Lay Drain")*, 108 N.C.App. 24, 422 S.E.2d 338 (1992). In *EZ Lay Drain*, a company, owned by the same individuals who own the plaintiff partnership in this action, brought suit against the state, the Transylvania County Health Department, and several officers and employees in their individual capacities. *See id.* at 28, 422 S.E.2d at 341. Among those officers sued in their individual

capacities was Terry Pierce, Director of the TCHD, also a defendant in the present action. *Id.* at 26–27, 422 S.E.2d at 340. Defendants in that action appealed the Superior Court's denial of their motion to dismiss based on state sovereign immunity. *Id.* The Court of Appeals reversed and held that when it was regulating sewage treatment and disposal systems under North Carolina General Statutes Chapter 130A, Article 11, and the corresponding regulations contained in Title 15A of the North Carolina Administrative Code, the Transylvania Health Department was acting as a state agency and was therefore entitled to immunity. Consequently, it ordered the Superior Court to enter summary judgment on behalf of all defendants and dismiss the action. *Id.* at 31, 422 S.E.2d at 343.

Furthermore, in assessing the individual liability of Terry Pierce, as Director of the TCHD, the court held that he was a "public officer." Because the plaintiff in that case failed to produce evidence that Pierce acted maliciously, the court held that Pierce was immune from personal liability. *Id.* at 30, 422 S.E.2d at 342.

Plaintiff urges this court not to follow the holding of the North Carolina Court of Appeals in *EZ Lay Drain* and attempts to distinguish the North Carolina Supreme Court case relied upon by the Court of Appeals, *Vaughn v. North Carolina Department of Human Resources*, 296 N.C. 683, 252 S.E.2d 792 (1979), in which the court held that the Director of the Durham County Department of Social Services was an agent of the Social Services Commission of the State Department of Human Resources. *Id.* at 690–91, 252 S.E.2d at 798. However, this court is constrained to take its guidance from this as yet undisturbed ruling of the North Carolina Court of Appeals as well as the Supreme Court's ruling in *Vaughn*.

In the present case, the court must find, as did the court in *EZ Lay Drain*, that the state exercised control over the Director of the Transylvania County Health Department in supervising installation of domestic septic systems and conclude that he was a state agent who acted on behalf of the NCDEHNR. It is true that the Transylva-

nia County Board of Commissioners has the exclusive authority to appoint and remove members of the Transylvania County Board of Health, but this authority is not dispositive if other factors compel a different conclusion. *See Vaughn,* 296 N.C. at 691, 252 S.E.2d at 798, where the other factors are listed.

Pursuant to North Carolina General Statutes Sections 130A–39(f) and 335(c), the Board of Health adopted by reference the regulations relating to installation of residential sanitary sewage systems adopted by the Commission of Health Services ("Commission") for the NCDEHNR. *See* N.C.Gen. Stat. § 130A–39(f), 335(c). The Board of Health adopted the Commission's regulations without adding any more stringent rules as it is permitted to do by statute. *See id.* § 130A–39(b), 335(c)(2). Under the statutory scheme, the local health director has the duty to enforce the rules of the local board of health. *Id.* § 130A–41(2). Thus, defendants Pierce and McGinnis merely enforced rules governing the installation of residential septic systems that the Board of Health adopted verbatim from the Commission's regulations.

Chapter 130A Sections 336 and 337 of the North Carolina General Statutes grant the local health department authority to issue improvement permits and subsequent certificates of completion for every septic system that it deems to be in compliance with the rules adopted pursuant to that Chapter governing installation of residential septic systems. *Id.* § 130A–336, 337. However, even though the statutes give the local department exclusive authority to grant these permits and certificates, it is merely enforcing the regulations promulgated by the State Commission for Health Services. Thus, although local health directors are given authority to apply these rules, they are merely enforcing the regulations promulgated originally by the state agency.

Moreover, the regulations governing approval of residential septic systems adopted by the Commission of Health Services, and by reference by the Board of Health, span thirty-nine pages and sixty-eight subsections of the North Carolina Administrative Code. *See* N.C.Admin.Code Tit. 15, r. 18.1900–1968 (1990). These regulations contain very specific, detailed requirements that must be satisfied in order for the local health departments to grant improvement permits, certificates of completion and operational permits. *Id.* For example, prior to issuing an improvement permit, local health department officials must investigate and evaluate exacting requirements for six different aspects of a potential site. The different aspects include the site's topography and landscape position, soil characteristics, soil wetness, soil depth, restrictive horizons and available space. *Id.* r. 18.1939–.1946. After analyzing the site as to each factor, the local health departments must make an overall determination as to suitability of the site with reference to these factors. *Id.* r. 18.1947. As this example illustrates, these regulations specify in great detail the manner and circumstances under which the local health directors and their employees may approve a residential septic system.

Thus, the state regulations control almost every aspect of the circumstances under which the local health director and his employees may approve a residential septic system. The state statutes give the local health department and its director final authority to grant improvement permits and certificates of completion. However, in granting these permits and certificates, very detailed, specific rules govern the local health director and his employees and direct the circumstances under which he may grant an approval. Thus, the overall control the state exercises over the director of the TCHD is every bit as stringent as that exercised over the county director of social services in *Vaughn* which plaintiff contends does not support the Court of Appeals in *EZ Lay Drain.*

On the question of funding the relevant statutes and regulations taken collectively merely demonstrate that the local health departments have authority to derive part of their own revenue themselves and are eligible to receive funds from the state and federal government; they do not specify the percentage allocation of funding among these sources. Unfortunately, neither party plead or proved facts demonstrating such a funding allocation. Thus, this factor is inconclusive

and, therefore, is not persuasive as it was in *Vaughn.*

Relating to the fourth and final factor identified by the *Vaughn* court, no North Carolina statute directly states that the local health department director acts as an agent of the NCDEHNR, as did a statute in *Vaughn.* The closest such statement contained in the statutes states, "When requested by the Secretary, a local health department shall enforce the rules of the Commission under the supervision of the Department [NCDEHNR]. The local health department shall utilize local staff authorized by the Department to enforce the specific rules." N.C.Gen.Stat. § 130A–4. This statute falls short of establishing that a local health director acts as an agent of the state.

A highly important aspect of the statutory scheme not discussed by the *Vaughn* court, however, has to do with the state's liability for the actions of the local health directors. Pursuant to North Carolina General Statutes Section 143–300.8 (1990),[1] the state Attorney General agreed to represent defendants Pierce and McGinnis in this action. In addition, pursuant to that same section, the state assumed liability for any judgment against these defendants. The state Attorney General's determination to represent these officials, which obviously was against the state's financial interest, is strongly persuasive that they were acting on behalf of the state.

The court finds unpersuasive plaintiff's arguments that the statute does not apply to this action. Plaintiff first asserts that under North Carolina General Statutes Section 143–300.4 (1990), the state is prohibited from defending an employee that the Attorney General determines has acted with actual malice. *Id.* § 143–300.4(a)(2). Plaintiff asserts that because actual malice was an indispensable element of the equal protection ver-

dict in its favor, the Attorney General is prohibited from representing the defendants. However, plaintiff misconstrues the statute.

The Attorney General's office possesses the responsibility for determining whether it represents an employee, and this determination is not made post-hoc by a jury verdict. North Carolina General Statutes Section 143–300.4(b) states, "The determinations required by subsection (a) of this section shall be made by the Attorney General." Thus, the jury's indispensable finding of actual malice has no effect on the Attorney General's ability or responsibility to represent the defendants. The fact that the Attorney General represented the official defendants necessarily implies that the office determined that they did not act with actual malice. Thus, the court rejects plaintiff's first argument.

Plaintiff also argues that the state will not be responsible for paying the judgment against the defendants because the County of Transylvania has an insurance policy covering it. Plaintiff asserts that under the statutory scheme, the state is only responsible to pay a judgment in excess of commercial liability coverage. N.C.Gen.Stat. §§ 143–300.8 and 143–300.6(c). Defendants counter, however, that plaintiff failed to prove any insurance coverage at trial and, therefore, cannot rely on its existence to refute the state's liability for the judgment.

Regardless of whose burden it was to establish such coverage, the court can only look to the record in determining post-trial motions, and at best, the record contains only an admission by defendants' counsel that the county had an insurance policy. However, the record does not establish the applicable coverage or the limits of this alleged policy; in fact, defendants' counsel explicitly disputed the coverage. Thus, no evidence in the

---

1. North Carolina General Statutes 143–300.8 provides:

    Any local health department sanitarian enforcing rules of the Commission for Health Services under the supervision of the Department of Environment, Health, and Natural Resources pursuant to G.S. 130A–4(b) shall be defended by the Attorney General, subject to the provisions of G.S. 143–300.4, and shall be protected from liability in accordance with the provisions of this Article in any civil or crimi-

nal action or proceeding brought against the sanitarian in his official or individual capacity, or both, on account of an act done or omission made in the scope and course of enforcing the rules of the Commission for Health Services. The Department of Environment, Health, and Natural Resources shall pay any judgment against the sanitarian, or any settlement made on his behalf, subject to the provisions of G.S. 143–300.6.

N.C. Gen.Stat. § 143–300.8 (1990).

record exists supporting plaintiff's assertion that the state will not be required to pay any portion of the judgment against defendants because of an alleged insurance policy purchased by the county. In the absence of such evidence under North Carolina General Statutes Section 143–300.8, the state is liable for any judgment against defendants.

Consistent with the North Carolina Court of Appeals' holding in *EZ Lay Drain* and the principles established by the North Carolina Supreme Court in *Vaughn*, the court finds that the state statutory scheme supports the conclusion that the TCHD and its director are agents of the state in enforcing the rules governing the installation of residential septic systems. Accordingly, under North Carolina law, defendants Pierce and McGinnis, in executing their duties as directors of the TCHD with respect to these rules, were agents of the State of North Carolina.

Thus, the suit against defendants Pierce and McGinnis in their official capacities is essentially a claim against the state itself. *See Kentucky v. Graham, supra.* Therefore, unless the state has waived its immunity, the suit against the official defendants is barred by the Eleventh Amendment. *See Edelman v. Jordan, supra,* 415 U.S. at 673, 94 S.Ct. at 1360.

But the plaintiff has not cited and the court finds no North Carolina statute that expresses the clear legislative intent necessary to waive the state's immunity. Thus, the Eleventh Amendment to the United States Constitution bars the action against defendants Pierce and McGinnis. Accordingly, the court must overturn the jury verdict and dismiss the plaintiff's action as to these two defendants.

■ In a related argument, Transylvania County argues that because defendants Pierce and McGinnis are agents of the state, there is no basis for holding it liable. The county's argument, as the court understands it, is not that it is entitled to Eleventh Amendment immunity. Rather, it argues that because defendants Pierce and McGinnis

were acting on behalf of the state and not the county in performing their duties as Directors of the TCHD, no evidence in the record supports the jury's verdict against it.

The court finds a decision of the Tenth Circuit Court of Appeals controlling on this issue. *See Arnold v. McClain,* 926 F.2d 963 (10th Cir.1991). In *McClain,* plaintiff filed suit against, among others, a local district attorney in his official capacity and the two counties that comprised the judicial district for which the district attorney served. *Id.* at 964. The court found that the district attorney was an agent of the state, and, therefore, the Eleventh Amendment barred the claim against him in his official capacity. *Id.* at 966. Based on the finding that the district attorney was a state official under state law, the court affirmed the dismissal of plaintiff's claims against the counties for failure to state a claim. *Id.*

In the present case, all plaintiff's evidence at trial related to the actions of defendants Pierce and McGinnis, either directly or in their supervisory capacity as directors of the TCHD. Thus no evidence exists in the record stating a claim against Transylvania County, and the court must also set aside the jury's verdict and enter judgment as a matter of law for Transylvania County.

Normally this would end the case as to plaintiff's equal protection claim, but since the court's ruling will doubtless be appealed the court deems it expedient to assume for purposes of argument that the court has jurisdiction of the action despite the Eleventh Amendment and proceeds to address the merits of the equal protection claim. Here again the court finds that plaintiff is not entitled to recover.

### 2. *Equal Protection Claim—Sufficiency of Evidence* [2]

■ At trial, plaintiff sought to prove that defendants violated the equal protection clause by selectively enforcing against it regulations relating to the installation of residential septic systems. As the Second Circuit has noted, selective enforcement is "a

---

**2.** In considering defendants' additional arguments, the court will assume that the official defendants' actions were attributable to the

county, contrary to the conclusion reached in the section on Eleventh Amendment immunity.

murky corner of equal protection law" in which there are relatively few cases. *LeClair v. Saunders*, 627 F.2d 606, 608 (2d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). The relatively few courts that have addressed the issue have held that in order to establish an equal protection violation based on the selective enforcement of a facially neutral law, plaintiff is required to prove two elements: First, plaintiff must establish that defendants treated it differently in applying the laws than it treated other similarly situated entities. Second, plaintiff must prove that defendants intentionally or purposefully discriminated against it in selectively enforcing the laws. *See Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *E & T Realty v. Strickland*, 830 F.2d 1107, 1112 (11th Cir.1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988); *LeClair*, 627 F.2d at 609–10.

### A. *Intentional or Purposeful Discrimination*

■ Because most courts addressing this "murky" area of equal protection law have focused on the second element, the court will address this element first. Plaintiff argues that defendants are procedurally barred from raising their objection because they failed to assert it as a grounds in their motion for judgment as a matter of law at the close of plaintiff's evidence, formerly characterized as a directed verdict motion. In defendants' reply to the present motion, they respond with the unsupported assertion that they expressly addressed this second component at the close of plaintiff's evidence.

Defendants' written motion for a directed verdict, however, refutes this assertion. In this motion, defendants cite the two requirements for an equal protection claim but then state, "[i]n this case, the plaintiff has failed to present any competent evidence as to the first element [selective treatment from others similarly situated]." Defendants' Motion for a Directed Verdict at 2. The defendants do not discuss the second component requiring intentional or purposeful discrimination in their motion. Furthermore, defendants cite and the court finds no argument in the transcript on the directed verdict hearing asserting such a position. Thus, defendants failed to assert this position in their directed verdict motion.

Several circuits have held that a party may not assert an argument in its post-trial renewed motion for judgment as a matter of law that was not asserted in its initial motion for judgment as a matter of law. *Diercks v. Durham*, 959 F.2d 710, 714 (8th Cir.1992); *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 367 (2d Cir.1988); *Bonjorno v. Kaiser Aluminum & Chemical Corporation*, 752 F.2d 802, 814 (3d Cir.1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986). The reason behind this rule is that the moving party should specify the exact grounds for a directed verdict and thus afford the non-moving party an opportunity to reopen its case and present additional evidence before the case is submitted to the jury. *See Smith*, 861 F.2d at 367; *Bonjorno*, 752 F.2d at 814.

Since defendants did not specifically assert that plaintiff failed to meet its burden on the intentional discrimination component of its equal protection claim in its initial motion for judgment as a matter of law, defendants are procedurally barred from asserting this argument in their post-trial motion.

### B. *Disparate Treatment: Similarly–Situated Entities*

■ However, defendants did argue vigorously in their directed verdict motion that plaintiff had not proven the first element of its equal protection claim. In order to prove this element, plaintiff had the burden of establishing at trial not merely that it was treated differently than other septic tank installers, but also that these entities were similarly situated. *E & T Realty*, 830 F.2d at 1109. An official's disparate treatment of dissimilarly situated entities does not implicate the equal protection clause. *Id.*

The few courts that have reached this element have required substantial proof of similar situations to satisfy this component of an equal protection claim. *See, e.g., id.* at 1111–12 (reversing district court's ruling finding equal protection violation because plaintiff failed to prove that other entity was similarly

situated); *Trafford v. Penno*, 800 F.Supp. 1052, 1057–59 (D.R.I.1992) (developer's failure to demonstrate that planning commission treated it differently than other similarly situated developers warranted entering summary judgment for defendant commission); *First National Bank and Trust Company v. Pope*, No. 85 C 5737, 1989 WL 44369 at *5–7 (N.D.Ill. April 24, 1989) (granting summary judgment to defendant because septic tank installer failed to prove that defendant treated it differently than other similarly situated installers).

Plaintiff sought to establish at trial that defendants selectively enforced the laws in several respects by imposing requirements upon them that were not required of other similarly situated septic tank installers in the area. Plaintiff's evidence primarily related to requirements for: (1) "stepdowns" in nitrification trenches; (2) depth of such trenches; (3) covering of nitrification lines; and (4) approval of recommended repairs.

### 1. Width and Height of "Stepdowns"

Plaintiff asserts that defendants selectively imposed on it a stepdown width requirement of two feet and a height requirement of twelve inches not imposed on other similarly situated installers. Plaintiff submits the following three pieces of evidence adduced at trial to support its claim: First, plaintiff advances Joe Gentry's statement that previously he approved stepdowns less than two feet in width. This statement, however, contains no reference to either the time or circumstances under which such approvals occurred and, therefore, fails to establish sufficient similarities to compare it with plaintiff's situation. Second, plaintiff submits Mike Houck's statement that TCHD officials previously approved stepdowns with widths less than two feet and heights less than twelve inches for plaintiff. Evidence relating TCHD's prior treatment of plaintiff, however, lends no support to plaintiff's claim that TCHD officials treated it differently than other similarly situated installers.

Third and finally, plaintiff offers the testimony of two septic system installers in Transylvania County, Mr. Zeb Hawes and Mr. Paul Pressley. However, the testimony of these witnesses establishes that defendants applied the same stepdown width and height requirements to Hawes and Pressley as they did to plaintiff. Interpreting this testimony in the light most favorable to plaintiff, it may indicate that defendants applied the more stringent rules to these other installers at a later date than they were applied to plaintiff. *See* Transcript of Witnesses Hawes & Pressley, at 13, 24–25, 43–44, 63–65.

■ Even assuming this time frame, however, this testimony lacks any evidence demonstrating the similarity between these situations and the present one. This type of evidence is insufficient as a matter of law to establish an equal protection violation. *E & T Realty*, 830 F.2d at 1109 (disparate treatment alone does not implicate the equal protection clause). Moreover, the equal protection clause does not require a government entity to apply its laws and regulations to all individuals at precisely the same time. *See id.* at 114 n. 9; *LeClair*, 627 F.2d at 608.

### 2. Depth of Nitrification Trenches

Plaintiff also contends that TCHD imposed on it more stringent requirements for the depth of nitrification trenches arising out of defendants' denial of a completion certificate on the Elliot system. As evidence that it was treated differently than other installers, again plaintiff offers the testimony of Hawes and Pressley. Plaintiff submits Hawes' statement that TCHD officials "probably" had approved trenches greater than three feet "on the upgrade side." Tr. at 14. Even ignoring the inconclusive nature of Hawes' comment, this testimony completely lacks evidence demonstrating any similarity with the present situation. It is impossible to determine from Hawes' remark whether defendants treated him differently than plaintiff without further details about the site on which he claims defendants approved a trench depth greater than three feet. *See Pope*, 1989 WL 44369 at *5 (statement that similar septic system denied to plaintiff had been approved at another site was insufficient without evidence of similarities between two sites).

Plaintiff also cites the testimony of Pressley who recalled that sanitarian Gentry approved a site with a trench depth of nine feet. Although Pressley's testimony is more definite than Hawes' comments, his statement illustrates dissimilarities not similarities with the present case. Pressley testified that at this site, sanitarian Gentry required him to install a trench nine feet deep to avoid coming within fifty feet of a nearby stream. Plaintiff presented no evidence that any similar condition required him to install the trench on the Elliot system at a depth greater than three feet.

Thus, neither Hawes' nor Pressley's testimony support a finding that TCHD officials treated plaintiff differently than other similarly situated installers with respect to trench depth. This evidence failed to develop sufficient similarities to support a claim that defendants selectively treated plaintiff. Therefore, the evidence was insufficient as a matter of law to support an equal protection claim. *See Pope,* 1989 WL 44369 at *5.

### 3. Covering of Nitrification Lines

Plaintiff argues that it was the only installer that defendants denied a certificate of completion for completely covering nitrification lines. The testimony of plaintiff's own witnesses, Hawes and Pressley, however, illustrates that defendants treated plaintiff the same as other installers in this respect. On cross-examination, Hawes testified that although defendants had told him not to cover nitrification lines prior to final inspection, he had never completely covered those lines. Tr. at 23–24. Moreover, in response to the next question, Hawes stated that he would not expect defendants to issue a certificate of completion if he covered the lines entirely. Tr. at 24.

Pressley testified to the same effect as Hawes. Tr. at 62. Pressley added that in one instance rain accidentally covered a line completely, and that TCHD personnel required him to uncover it before issuing a certificate of completion. Tr. at 62–63. Contrary to supporting plaintiff's claim, therefore, the testimony of both Hawes and Pressley demonstrates that defendants treated other installers and plaintiff similarly with respect to the covering of nitrification lines. Thus, plaintiff's evidence negates its disparate treatment claim.

Plaintiff also argues that it was the only installer defendants threatened with criminal prosecution for completely covering nitrification lines. In support of this argument, plaintiff advances Mike Houck's statement, corroborated by defendant McGinnis, that he believed that plaintiff was the only installer defendants threatened with criminal prosecution in such a dispute. However, plaintiff presented no evidence of other installers that intentionally covered nitrification lines but were not threatened with criminal prosecution. Therefore, plaintiff's evidence on this point fails to establish that defendants treated it differently than other similarly situated installers.

### 4. Denial of Repair Proposals

Plaintiff contends that it was the only installer that TCHD officials refused to issue a permit to make repairs it thought necessary for a customer's septic system. In support of this argument, again plaintiff relies on the testimony of Hawes and Pressley. First, plaintiff advances the statement of Hawes on direct-examination that TCHD sanitarians never contradicted a recommendation for repair he made to a customer. Tr. at 19. Hawes, however, did not testify as to any details of any such recommendations.

Moreover, Pressley testified that TCHD officials had contradicted him on repairs he recommended to customers. Tr. at 49. Merely as an example, on cross-examination Pressley elaborated about a situation approximately three years prior to trial in which TCHD initially contradicted him but eventually allowed him to make such a repair. Pressley, however, did not elaborate on the other instances referred to in his direct examination in which TCHD sanitarians disapproved of his proposed repairs. Pressley's testimony, contrary to supporting plaintiff's claims, therefore, demonstrates that TCHD officials treated other installers similarly to plaintiff in contradicting repair proposals. Thus, this evidence negates plaintiff's claim for selective enforcement. *See Plampin v. United States Fidelity and Guaranty Com-*

*pany,* 463 F.Supp. 972, 974–75 (D.S.C.1978) (evidence that police officer gave other motorists traffic summons for same offense "completely negates any claim of selective enforcement").

Plaintiff also argues that it was the only installer defendants prosecuted for making repairs without a permit. In its response, plaintiff asserts that defendants did not introduce evidence that it prosecuted any installer, other than Harold Houck, for making repairs without a permit. However, defendants do not have the burden of disproving allegations of selective enforcement; plaintiff has the burden of establishing that defendants did not prosecute other similarly situated installers that did repairs without a permit.

Plaintiff advances as its only evidence on this issue, Pressley's testimony on direct examination that TCHD officials sent him letters intimating that he needed a permit before he could make repairs. Tr. at 45–46. Interpreted in the light most favorable to plaintiff, this testimony may indicate that there were instances in which other installers made repairs without a permit and were not prosecuted by defendants. However, the testimony does not indicate any more exact details about the incidents or its similarities to the present case. The court holds that such evidence is inadequate as a matter of law to establish sufficient similarities to support an equal protection claim.

### 5. Other Evidence

Plaintiff presented considerable evidence at trial indicating that beginning in 1986–87 the TCHD changed its interpretation of its rules governing the installation of residential septic systems. Evidence of defendants' change in interpretation of the rules does not state a claim for an equal protection violation. Plaintiff must establish that defendants selectively enforced any such change in interpretation solely against it to establish an equal protection claim. *Pope,* 1989 WL 44369 (septic tank inspector's change in policy and procedures was insufficient to support a claim for equal protection because plaintiff failed to present evidence that defendant se-

lectively enforced this new interpretation only against it).

Furthermore, plaintiff also asserts that evidence suggesting that defendants advised plaintiff's customers not to do business with it was inherently disparate treatment. However, any evidence of such advice does not relate to the selective enforcement of any laws. Therefore, the court notes that this evidence is not germane to the equal protection claim and will be analyzed in the subsequent section on plaintiff's state law claim for tortious interference with contractual relations.

### 6. Conclusion on Disparate Treatment Evidence

The evidence produced at trial in large part demonstrates that defendants treated plaintiff similarly, not differently, than other installers. Moreover, in the instances in which defendants did treat plaintiff differently than other installers, the evidence demonstrates either that plaintiff failed to prove sufficient similarities with the present case or that the disparate treatment was based on dissimilarities with plaintiff's situation. Therefore, plaintiff's evidence was insufficient as a matter of law to establish this component of its equal protection claim because it failed to prove that defendants treated it differently than other similarly situated septic tank installers. Accordingly, even assuming the court has jurisdiction of the equal protection claim, plaintiff's evidence fell far short of substantiating the claim, and the verdict based thereon must be set aside and judgment entered for defendants as a matter of law pursuant to Federal Rule of Civil Procedure 50(b).

### 3. *Tortious Interference with Contractual Relations Claim*

■ The court also submitted to the jury, plaintiff's pendent state law clam for tortious interference with contractual relations. Since both parties are citizens of North Carolina and all the actions germane to this claim occurred in the state, this court will apply North Carolina tort law in determining the issue.

■ In order to establish a prima facia case for this tort in North Carolina, plaintiff must prove five essential elements: (1) plaintiff had a valid contract with a third person; (2) defendant had knowledge of plaintiff's contract with the third person; (3) defendant intentionally induced the third person not to perform his contract with plaintiff; (4) defendant acted without justification; (5) defendant's act caused plaintiff actual damages. *Childress v. Abeles,* 240 N.C. 667, 674, 84 S.E.2d 176, 181–82 (1954); *You v. Roe,* 97 N.C.App. 1, 9, 387 S.E.2d 188, 192 (1990).

### A. *Interference with Contractual Relations*

Defendants assert that plaintiff failed to introduce sufficient evidence at trial to establish the third and fourth elements. First, defendants assert that plaintiff produced no evidence that any party failed to perform its contract with plaintiff because of their actions. However, defendants misconstrue the third requirement.

The North Carolina Court of Appeals rejected an identical argument in *Lexington Homes, Inc. v. W.E. Tyson Builders, Inc.,* 75 N.C.App. 404, 413, 331 S.E.2d 318, 322 (1985). In *Lexington Homes,* the court rejected the argument that a plaintiff must prove an actual breach of contract to satisfy the third element. Rather, the court held that, consistent with the tort's name, a plaintiff must prove only that the opposing party interfered with its rights under the contract. In *Lexington Homes,* the court held that defendant's actions in inducing a bank to stop payment on a check to the plaintiff constituted wrongful interference. *Id.*

Thus, plaintiff in this case had to produce evidence that defendants interfered with one of plaintiff's valid contracts. Plaintiff asserts that defendants interfered with its contracts with customers by refusing to give certificates of completion on the Elliot, Morrow and Shuttleworth systems and by failing to approve repair proposals plaintiff made to its customers. The court will assume that defendants' actions in exercising their statutory duty could be construed to constitute interference with plaintiff's contracts. However,

the court will address the wrongful nature of these actions in the subsequent section.

Plaintiff's other evidence that defendants interfered with contracts with its customers consists of the testimony of Charles Smith, an employee of Ms. Shuttleworth. Mr. Smith testified that in response to a question by him about whether plaintiff should make the changes that the TCHD was requiring to the Shuttleworth system, defendant McGinnis replied that plaintiff could but that he would not recommend it. *See* Plaintiff's Ex. 21, Para. 7. Evidence produced at trial also demonstrated that Ms. Shuttleworth hired another installer to make the necessary repairs. Ms. Shuttleworth did not testify at trial, and plaintiff produced no evidence explaining why she hired another installer.

Interpreted in the light most favorable to plaintiff, the court holds that a reasonable jury could have drawn the inference that defendants' actions in these two respects constituted interference with plaintiff's contractual relations. Thus, the court holds that plaintiff produced sufficient evidence to establish the third element of its tortious interference claim.

### B. *Without Justification: Malice*

The parties dispute whether in order satisfy the fourth requirement, plaintiff was required to prove legal or actual malice. Plaintiff contends that it must only establish actual malice and that it produced abundant evidence of ill-will or personal hatred. Contrariwise, defendants claim that plaintiff must prove legal malice and that all the evidence plaintiff adduced at trial demonstrates that defendants acted within their legal authority.

■ North Carolina case law on the issue conclusively establishes that legal not actual malice is required. *Childress v. Abeles,* 240 N.C. at 675, 84 S.E.2d at 182; *You v. Roe,* 97 N.C.App. at 9–10, 387 S.E.2d at 192; *Murray v. Justice,* 96 N.C.App. 169, 174, 385 S.E.2d 195, 199 (1989), *review denied,* 326 N.C. 265, 389 S.E.2d 115 (1990); *Ramsey v. Rudd,* 49 N.C.App. 670, 673–74, 272 S.E.2d 162, 164 (1980), *petition denied,* 302 N.C. 220, 276 S.E.2d 917 (1981).

For example in *Childress,* the court stated, "The term 'malice' is used in this connection in its legal sense, and denotes the intentional doing of a harmful act without legal justification." *Childress,* 240 N.C. at 675, 84 S.E.2d at 182. The court added, "Indeed, actual malice and freedom from liability for this tort may coexist. If the outsider [defendant] has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be." *Id.; see also Murray,* 96 N.C.App. at 174, 385 S.E.2d at 199 (actual malice is not sufficient); *Murphy v. McIntyre,* 69 N.C.App. 323, 329, 317 S.E.2d 397, 400 (1984) (same).

The evidence plaintiff produced at trial to support this fourth element is the same as in the third requirement. With respect to the evidence of defendants, refusal to issue completion certificates to plaintiff and to approve repairs recommended by it, plaintiff did not produce any evidence that defendants acted outside their legal authority. Accordingly, the court holds that this evidence is insufficient as a matter of law to constitute legal malice. *See Murray v. Justice,* 96 N.C.App. at 174, 385 S.E.2d at 199 (affirming trial judge's grant of summary judgment to defendant because forecasted evidence failed to demonstrate that defendant was acting outside of his authority); *Ramsey v. Rudd,* 49 N.C.App. at 673–74, 272 S.E.2d at 164 (affirming grant of summary judgment for defendant because evidence demonstrated that defendant acted pursuant to his authority in reporting plaintiff to his supervisor).

The other evidence plaintiff produced at trial relating to this element is the conversation between defendant McGinnis and Mr. Smith, Ms. Shuttleworth's employee. In direct response to a question by Mr. Smith about whether plaintiff should be hired to do the repairs, defendant McGinnis stated that he would not recommend it. Plaintiff asserts that defendant McGinnis was without justification in making this statement and, therefore, this statement proves legal malice.

The North Carolina Court of Appeals decision in *You v. Roe* is instructive on this issue. In *Roe,* the plaintiff alleged that the defendant doctor tortiously interfered with his employment contract by recommending to the Hospital that the plaintiff researcher be dismissed. *You v. Roe,* 97 N.C.App. at 9, 387 S.E.2d at 191. Plaintiff asserted and the court acknowledged that evidence existed in the record demonstrating defendant's malicious motives in recommending plaintiff's termination. However, the court held that plaintiff produced no evidence that defendant's actions were beyond the scope of his authority. *Id.* at 10, 387 S.E.2d at 192. Accordingly, the court affirmed the trial court's grant of summary judgment for defendant.

The court finds defendant McGinnis' action in this case analogous to the defendant's recommendation in *Roe.* Therefore, the court finds that defendant McGinnis' recommendation was insufficient as a matter of law to constitute legal malice. Thus, plaintiff failed to produce any evidence to support the fourth element of its tortious interference claim. Accordingly, the court must set aside the jury verdict for plaintiff and enter judgment as a matter of law for defendants on this claim.

### 4. *State Sovereign and Governmental Immunity*

Defendants assert that under North Carolina common law, they are entitled to governmental immunity for any torts committed while performing a government function. Plaintiff responds that governmental immunity is an affirmative defense, and defendants failed to meet their burden of proof on this issue. The court finds that defendants are entitled to governmental immunity from plaintiff's tortious interference claim.

Under North Carolina common law, a county is not liable for the torts of its officers or employees for activities that are "governmental" in nature, but is responsible for actions that are "proprietary" in nature. *Hare v. Butler,* 99 N.C.App. 693, 698, 394 S.E.2d 231, 235, *review denied,* 327 N.C. 634, 399 S.E.2d 121 (1990). This "governmental immunity" extends to county officials sued in their official capacities. The court assumes for purposes of this discussion that the official defendants were county and not state officers. If the official defendants were state officials they would be absolutely immune

from plaintiff's tortious interference claim, regardless of whether their actions were "governmental" or "proprietary" in nature. *EZ Lay Drain*, 108 N.C.App. at 29, 422 S.E.2d at 341 (the TCHD is an agent of the state and therefore is entitled to state sovereign immunity). *Baucom's Nursery Co. v. Mecklenburg County*, 89 N.C.App. 542, 544, 366 S.E.2d 558, 560, *review denied*, 322 N.C. 834, 371 S.E.2d 274 (1988); *see also Lenzer v. Flaherty*, 106 N.C.App. 496, 514, 418 S.E.2d 276, 288 (affirming dismissal of tortious interference with contractual relations claim against officials sued in their official capacity based on governmental immunity), *review denied*, 332 N.C. 345, 421 S.E.2d 348 (1992).

The enforcement of laws and regulations is a governmental activity entitling a county and its employees to immunity for any tortious actions. *Hare*, 99 N.C.App. at 699, 394 S.E.2d at 235 (investigation of child abuse by social service workers and agency is governmental function); *Baucom's Nursery*, 89 N.C.App. at 544, 366 S.E.2d at 560 (enforcement of zoning ordinance is governmental function entitling county and individual county commissioners to immunity). The court holds that defendants' acts in enforcing its rules relating to the installation of residential septic systems is a governmental function.

■ In its first response, plaintiff argues that defendants Pierce and McGinnis would be liable despite governmental immunity because they acted with malice. Plaintiff presumably was referring to the malice "exception" for public officials and employees sued in their individual capacities. Both public officials and public officers are liable for malicious acts if sued in their individual capacities. *Hare*, 99 N.C.App. at 700, 394 S.E.2d at 237. However, plaintiff voluntarily dismissed its claims against all remaining defendants in their individual capacities at the commencement of trial. This malice "exception" has no application to suits against officials in their official capacity and, thus, has no bearing on the resolution of this case. Perhaps in recognition of this fact, plaintiff failed to reiterate this argument in its second response.

■ As plaintiff notes in its responses, a government entity can waive immunity through the purchase of insurance. Pursuant to North Carolina General Statutes Section 153A–435(a) (1987), governmental immunity is waived to the extent of insurance coverage purchased "for any act or omission occurring in the exercise of a governmental function." *Id.* Plaintiff argues that because governmental immunity is an affirmative defense, defendants had the burden of proof on this issue.

As an affirmative defense, defendants did have the initial burden of establishing that their actions constituted a governmental function. *Jones v. City of Burlington*, 58 N.C.App. 193, 195, 293 S.E.2d 252, 254 (1982) (reversing summary judgment for defendants because genuine issue of material fact existed as to whether defendant's actions were governmental or proprietary in nature). However, plaintiff does not dispute that defendants' actions constituted a governmental function. Rather, plaintiff argues that defendants waived their immunity by purchasing liability insurance.

■ Contrary to the assertions in its response, North Carolina case law conclusively establishes that plaintiff carries the burden of establishing that defendants have waived their governmental immunity by purchasing insurance. *Hare*, 99 N.C.App. at 699, 394 S.E.2d at 235 (affirming dismissal of claims against social service workers and agency because plaintiff failed to produce evidence that defendants waived their immunity by purchasing insurance); *Baucom's Nursery*, 89 N.C.App. at 544–45, 366 S.E.2d at 560 (affirming summary judgment of claims against county and individual commissioners because plaintiff failed to present any evidence that county purchased liability insurance).

As stated before, plaintiff failed to produce evidence at trial that defendant Transylvania County purchased liability insurance that covered the actions in question. Thus, plaintiff has failed to meet its burden of establishing a waiver of defendants' governmental immunity, and all three defendants are therefore entitled to governmental immunity from plaintiff's tortious interference with contractual relations claim. Accordingly, defendants

are entitled to judgment as a matter of law on plaintiff's tortious interference claim.

### B. *Rule 59 Motion for a New Trial*

▮ Defendants move this court in the alternative for a new trial asserting that the jury verdict of $350,000 was excessive and that the verdict was clearly against the weight of the evidence. The court agrees on both counts. Plaintiff's contention that the evidence of good will lost by it as a result of the dispute with defendants justifies the jury's damage award is far from persuasive. The principals in the plaintiff corporation apparently have chosen voluntarily to promote their new business of EZ Lay Drain Company and to limit the Houck corporation's business to repair work. There was no evidence from which the jury could find that these two ventures are not successful.

▮ Under established Fourth Circuit law, the trial judge has a duty to set aside a verdict as excessive and grant a new trial if the verdict is "against the clear weight of the evidence ... or will result in a miscarriage of justice." *MCI Telecommunications Corporation v. Wanzer*, 897 F.2d 703, 708 (4th Cir.1990) (quoting *Gill v. Rollins Protective Services Company*, 836 F.2d 194, 196 (4th Cir.1987)); *see also Johnson v. Hugo's Skateway*, 949 F.2d 1338, 1347 (4th Cir.1991). Moreover, unlike in a motion for JNOV, in a motion for a new trial the district court has not only the discretion but the duty to assess the credibility of witnesses and weigh the evidence. *Swentek v. USAir, Inc.*, 830 F.2d 552, 559 (4th Cir.1987); *Wyatt v. Interstate & Ocean Transport Company*, 623 F.2d 888, 891 (4th Cir.1980).

▮ A district court should set aside a verdict if the award bears no rational or reasonable relationship to the damages proved and, therefore, is not supported by the evidence. *Filkins v. McAllister Brothers, Inc.*, 695 F.Supp. 845, 851 (E.D.Va.1988). In other words, the court should grant a new trial if the verdict is so excessive so as to "shock the conscience" and demonstrate that it was not the product of a fair and impartial decision. *Id.* Finally, a court should set aside a verdict as excessive if it "is clearly in excess of the amount which the evidence shows plaintiff is justly entitled to recover." *Id.* at 854. And while the court is always reluctant to disturb a jury's finding on the liability issue where there is any substantial evidence to support it, where, as here, the plaintiff's evidence of liability, as shown by the court's discussion of the equal protection claim, was so lacking in probative force, the court is unable to allow the verdict to stand.

Plaintiff advances several instances of testimony that it asserts justify the jury's verdict. Primarily, it argues that the testimony of witnesses Charles Morgan and William Ives demonstrates that the good will Harold Houck developed in thirty years of business was destroyed as a result of its dispute with defendants. Plaintiff asserts that this testimony demonstrates that these "prominent citizens" of the community had high regard for the plaintiff before the dispute but were reluctant to do business with it after the dispute. While this is some evidence of loss of good will to some degree, it ignores the uncontradicted evidence that the two businesses of the Houcks are continuing to prosper, and it is wholly insufficient to justify a verdict of $350,000. In addition, plaintiff argues that its new-installation business decreased markedly beginning in 1986. However, as defendants note and plaintiff admits, plaintiff's profits from its repair business increased in that same period. In fact, Mike Houck testified that the partnership made a deliberate choice to channel more of its resources away from its new-installation and toward its repair business because the latter was more profitable.

Regardless, plaintiff offered no evidence relating to past or future profits on which a jury could base a verdict of $350,000. The only evidence of plaintiff's profits relating to its new-installation business was that in the calendar year 1986, plaintiff installed about eight systems and made approximately $400 on each system. A profit of approximately $3,200 for a calendar year over a few short years is not rationally related to a verdict of $350,000.

In short, the court holds that the jury's verdict on all the issues was against the clear weight of the evidence; that the award of $350,000 was excessive and shocks the conscience of the court; and that even if the court should be found in error in granting

defendants judgment as a matter of law, at a minimum the court must set aside the jury verdict and grant the defendants a new trial on all issues, and it will be so ordered.

### III. *CONCLUSION*

Defendants Pierce and McGinnis were acting on behalf of the state in all actions underlying this suit and, therefore, are entitled to Eleventh Amendment immunity and are entitled to dismissal of the action. Because the liability of Transylvania County was premised solely on the actions of these official defendants, the action against the county must also be dismissed.

Alternatively, all three defendants are entitled to judgment as a matter of law based on the insufficiency of the evidence on both plaintiff's equal protection and tortious interference with contractual relations claims. In addition, under North Carolina common law all defendants are entitled to governmental immunity from plaintiff's tortious interference with contractual relations claim. Finally, even if this court had jurisdiction and all defendants were not entitled to judgment as a matter of law, the jury verdict is clearly against the great weight of the evidence and defendants are therefore entitled to a new trial on all issues.